## FLICKWIR & BUSH, Inc., v. PONTYNEN.

### (Circuit Court of Appeals, Third Circuit. December 20, 1916.)

### No. 2151.

MASTER AND SERVANT ⬡═➡286(24)—INJURY TO EMPLOYÉ—NEGLIGENCE—QUESTION FOR JURY.

Evidence in an action for death of an employé from the breaking of a chain used in hoisting heavy loads, as to its condition and infrequent and superficial inspection, *held* to make a case for the jury as to the master's negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1029; Dec. Dig. ⬡═➡286(24).]

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Action by Anna Pontynen against Flickwir & Bush, Incorporated. Judgment for plaintiff, and defendant brings error. Affirmed.

Vroom, Dickinson & Bodine, of Trenton, N. J. (Joseph L. Bodine, of Trenton, N. J., and William G. Wright, of Philadelphia, Pa., of counsel), for plaintiff in error.

J. Alfred Anderson, of Boston, Mass., W. Holt Apgar, of Trenton, N. J., and William A. Pew, of Salem, Mass., for defendant in error.

Before BUFFINGTON and McPHERSON, Circuit Judges.

BUFFINGTON, Circuit Judge. This is a personal injury case, brought by Anna Pontynen, a citizen of Russia, against Flickwir & Bush, Incorporated, a corporate citizen of New Jersey, to recover damages for the death of her husband, Anton Pontynen, defendant's employé. The cause was tried, and resulted in a verdict for plaintiff. On entry of judgment on such verdict, defendant sued out this writ.

The general work which was being carried on by the defendant, and in which the decedent was killed, we have described in an opinion just filed in Flickwir v. Walkonen, 238 Fed. 307, — C. C. A. —, a case in this court. We avoid repetition by reference to such opinion and adding that Pontynen was a carpenter working on the wooden frames between which each pier was constructed. While so at work he was struck by a flying chain, knocked off, and killed by a fall to the ground, about 130 feet, below. At the time of the accident, Pontynen was engaged in helping raise an outer form section. It was about 30x17 feet and weighed several tons. In hoisting it a twin chain, spaced in the middle by a ring which was attached to a block, was used. These free ends, which were some 18 feet long, were fastened to the form which was to be raised. A link in one of these chain sections broke near to where it was fastened to the form, and the loose end snapped around Pontynen, who was standing on the edge of the pier, and threw him down to the ground. Pontynen's duty was to stand at that point and signal the engineer when the form was to be hoisted. When killed, he was just about to give the signal.

⬡═➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The alleged negligence of the defendant was the use of an unsafe chain and the negligent inspection thereof, and the crucial question was whether there was such evidence of negligence as made the case one for a jury. In that regard the proof was that the chain which broke was part of a larger one defendant had bought from a reputable dealer some time before the accident. It had been in general use for some months, and when this shorter length was taken from it a hook with a larger ring to it had been fastened to the end of the chain. It was the last chain link which broke. It was interlinked with the large ring attached to the hook. Whether the last ring on the chain or the ring on the hook had been cut and rewelded to effect the juncture did not appear; but, whichever one was cut, the rewelding was done by the defendant at its shop on the work. These chains were subjected to hard usage, and at times were thrown down from the tops of these high piers. The broken link was found after the accident, and showed a fracture of substantial depth and length, where welded, which bore evidence of not being recent. Expert testimony was produced by plaintiff tending to show that the welding at the break was defective, and that in the new fracture a crystallization from overstrain was shown.

After explaining these matters, an expert witness of large experience testified as follows:

"Q. Before this break occurred, was there anything that would indicate, to any one inspecting that, that there was a flaw there, and that that link was weakened and was unsuitable for use? A. Yes. Q. And was it obvious from inspection from the outside? A. Yes; no human eye can determine the degree of that unsoundness here, but, when that order or condition exists, it is a fair assumption, to those trained in the inspection or testing of such material, that that degree of disorder on the surface is an indication of further disorder within. Q. Would you just describe before this link was broken, if it had been inspected, what would an inspector see there that would indicate to him that that link was defective? A. A sufficient measure of disorder to justify its rejection. Q. Just what was the physical condition he would see there? A. A broken surface of considerable dimension, and a condition externally indicating further disorder within. Q. He would see a break there, and between what points would that break be noticeable? A. At the most critical and tender spot of the link, where the scarf is welded. Q. Yes; but what is the space between? A. In this case it is a quarter of an inch long by an eighth of an inch in depth. That is visible. How much more no one could determine underneath until fractured. Q. That is, you would see this break from the outside? A. Yes. Q. That would appear as a crack, you say? A. Yes; and a disorder at a critical point. Q. And by a critical point, what do you mean by that? A. The point of juncture between each end of the link before welding. Q. It is on the scarf, you say? A. It is right in the scarf, the usual place for ills of that kind. Q. And, if you will, give me those distances again. That crack would have been how? A. About a quarter of an inch long by one-eighth of an inch in length, or diameter, rather. Q. That would be apparent when the chain was new? A. Without any doubt. Q. As the chain was used from time to time, what effect would that have on that exterior crack? A. Further impairment—an extension of the trouble. Q. And would it open the crack at all? A. It would, or it might not open appreciably, but it would burrow underneath—decrease its strength underneath. Q. Now, in looking at—you call this the scarf (indicating)? A. That is the end of the scarf. Q. I notice that the end of the scarf is discolored a brown, and that on the face it is more of a black? A. The brown is a rust that has set in since the fracture. Originally it was bright, by reason of contact with the side opposite. Q. So does that discoloration by rust indicate to you how long that crack had been there? A. Yes, sir; in that case. It was born that

way. Q. And born with a crack in it as deep as the face of that? A. Undoubtedly. * * * Q. Now, you say, when this chain was made, that was imperfectly welded there? A. All my experience points to that deduction. Q. And what caused that? A. Lack of fusion. It may have been caused by dross in the metal, a condition often encountered. It may have been caused by carelessness in the welding, the blacksmith having performed his work imperfectly. * * * Q. Now, do I understand you to say that this crystallization that you notice on the opposite side indicates something about the use that this chain was put to? A. It indicates a condition of fatigue resulting from a severe stressing or impact due to violent use. Q. That crystallization, could that be seen by outward inspection? A. Impossible. Q. Now, can you give us any idea what the life of a chain of that kind is? A. No one can. Q. It depends on the work? A. The measure of work imposed regulates that. Those chains have been known to fail in six months. They have been known to resist excessive wear even for six years. Much depends on the character of the material. * * * Q. Now, there was nothing on the outside to indicate the crystallization? A. Nothing. Q. And you have explained to us the evidences that you see here, which would indicate on inspection that this was a defective link; that is right, is it? A. Yes, sir. Q. And it is the imperfect welding here which you say was apparent from the outside? A. That is apparent from the outside. Q. You cannot say to what extent that imperfection would go into the interior? A. No, sir. Q. No man can say that? A. No; that is regulated by the range of vision only. * * * Q. Now, looking at this broken link, can you tell by the color how long this defect had existed previous to the break? A. Not a part of it, but from the end of the scarfed section up to the flat cross-section. Q. You mean from the end of the scarfed section, this little form here (indicating)? A. Yes; from there throughout its depth that disorder existed from the beginning. We can now see into the fracture, and can reach that conclusion without error. Q. And does the discoloration indicate anything to you? A. It indicates a progressive extension of the fracture. * * * Q. Now, would this, at the time this link was new and fresh, and in a chain like this one down here, and this crack had not occurred here, and it had not been subject to this break, would this flaw that you mention have been revealed to the naked eye? A. It would. Q. Would it have been revealed to the eye of a man less skilled in his profession and calling than you? A. Yes; but its importance might not be appreciated. * * * Q. Would the crystallization in that link have been visible to the naked eye? A. Not outwardly, but, when fractured, yes, unmistakably. * * * Q. And you are speculating as to how that link looked before it broke? A. Not with reference to the defect. Q. But you spoke of a defect. Was that defect as noticeable before the chain broke as it is now? A. I believe it was."

A second witness also testified to the same general effect as follows:

"Q. Is that weld there perfect? A. No. Q. Now, have you got that chain together, the links together? A. Yes. Q. Holding the parts of that link together the way they fit, are there any signs on the exterior of that link which indicate an improper welding? A. There are. Q. And what are those exterior signs? A. The point of the scarf, about one-quarter inch long and one-quarter inch wide, indicates it. Q. What about that scarf? A. When it was scarfed and turned around in that manner (indicating), it was welded down, and something foreign got into it, and the scarf failed to unite, and that we call a 'sprawl.' Q. Is that the same thing that Mr. Cone called a 'peening'? A. I think it is. Q. When that weld was made, what do you say was in there between that prevented a proper welding? A. Some foreign matter; I don't know really what it was—slag, I presume. * * * Q. After that chain was made and was welded, and before it was broken, what do you say the signs were on the exterior part of that link—just describe them—which would indicate that there was an improper or imperfect welding? A. The little cracks on each side of the tongue of the scarf. Q. What is the shape of that tongue? A. It is pointed about, I should say, three-eighths of an inch long, and one-quarter of an inch wide. Q. Were those cracks there after

the welding was done?  A. They were.  Q. Could they have been seen on inspection?  A. They could.  * * *  Q. In examining that special link, before it broke, what was there on the outside that would indicate any defect to that chain?  A. This unwelded sprawl.  Q. How would that show? A. It showed by this piece being broken off here; showed this dark color. Q. Take it before the piece was broken at all.  A. It showed—just showed two cracks in the scarf.  Q. Those cracks could be seen?  A. They could.  Q. Now, is there any significance in seeing a crack in that part of the link near the weld?  A. There is.  Q. What is the significance?  A. It shows there is something foreign in between that prevented it from uniting.  Q. Seeing that crack, that imperfect welding, from the outside, what would that indicate as to the condition of the material inside the link?  A. It would indicate that there was a foreign substance there, and be dangerous to use it any further.  Q. You couldn't tell how badly it was gone on the inside?  A. I couldn't tell how bad it was.  Q. It would be a suspicious link?  A. It would be a suspicious link.  Q. What sort of inspection would reveal that sprawl, that imperfect welding?  A. Just lay it on the floor or ground, and take hold of the hook, and go over it link for link, the whole length of it.  Q. See it with the eye?  A. You can see it with the eye.  * * *  Q. What is there about that chain that you see that indicates that it has had any rough use, as far as sustaining weight?  A. Crystallization.  Q. That is on one side?  A. On both sides.  Q. Anything else about the chain?  A. Yes; the wear in the throats of the chain.  Q. Wear in where?  A. The throat.  Q. Is the wearing in the throat of that chain any indication to you of the use it has had?  A. Yes. Q. And the crystallization?  A. Yes.  Q. And what do they indicate to you? A. They indicate to me that they have lifted heavy weights and were used quite a little, a long time.  Q. If a chain has been used lifting heavy weights, as this indicates, what would be a practical way of examining that chain? A. Looking it over with the eye, link for link.  Q. How often should you say the chain ought to be looked over?  A. A chain of this kind, I should say it should be looked over every two or three days.  Q. How long would it take to look it over?  A. Three or four minutes, a very few minutes to look the chain over."

On cross-examination he said:

"Q. How large would you say this crack was before the links broke?  A. I think it was a crack you could run your finger nail along.  It was not much of a crack, but it was visible enough so you could stick your thumb nail in.  Q. You think so?  A. I think so."

In view of this testimony and all the circumstances, the character of the work done, the strains upon these chains, the infrequency and alleged superficial character of such inspections as were made, we think the court would have transcended its powers and province had it held as a matter of law that there was no proof of negligence.  The case was peculiarly one for a jury.

The judgment below is therefore affirmed.